**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GULFPORT ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 20-35562 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| GULFPORT ENERGY CORPORATION, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs. | ) | Adv. Pro. No. 20-____ |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

**GULFPORT ENERGY CORPORATION'S VERIFIED ORIGINAL COMPLAINT FOR**
**DECLARATORY JUDGMENT, *EX PARTE* TEMPORARY RESTRAINING ORDER,**
**AND PRELIMINARY AND PERMANENT INJUNCTION**

Gulfport Energy Corporation, together with its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases ("Plaintiffs" or "Debtors"), allege for their verified original complaint (this "Complaint") against defendant the Federal Energy Regulatory Commission ("FERC" or "Defendant"), upon knowledge of their own acts and upon information and belief as to all other matters, as follows:

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Gulfport Energy Corporation (1290); Gator Marine, Inc. (1710); Gator Marine Ivanhoe, Inc. (4897); Grizzly Holdings, Inc. (9108); Gulfport Appalachia, LLC (N/A); Gulfport MidCon, LLC (N/A); Gulfport Midstream Holdings, LLC (N/A); Jaguar Resources LLC (N/A); Mule Sky LLC (6808); Puma Resources, Inc. (6507); and Westhawk Minerals LLC (N/A).  The location of the Debtors' service address is:  3001 Quail Springs Parkway, Oklahoma City, Oklahoma 73134.

**Brief Statement of the Case**

1.     This is an adversary proceeding brought pursuant to 28 U.S.C. § 2201, sections 105, 106(a), and 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 7001(7), (9) and 7065 of the Federal Rules of Bankruptcy Procedure for declaratory judgment, a temporary restraining order, and preliminary and permanent injunctive relief. Given FERC has already issued orders that attempt to usurp this Court's jurisdiction and interfere with the Debtors' right to reject certain executory contracts under the Bankruptcy Code, the Debtors are filing this adversary proceeding and seeking a temporary restraining order to enjoin FERC from issuing or enforcing any order or ruling that (a) might interfere with this Court's exclusive jurisdiction to decide any rejection motion that Debtors have brought or may bring, (b) may hinder the Court's ability to administer the reorganization of the Debtors' estates, or (c) purports to enforce or compel performance of obligations of the Debtors under any contract for which rejection is approved by the Bankruptcy Court.

2.     Pursuant to separate motions, Gulfport is seeking to reject, pursuant to section 365 of the Bankruptcy Code and binding Fifth Circuit precedent, certain negotiated rate firm natural gas transportation service agreements, including the REX Agreements, ANR Agreements, Columbia Gas Agreement, Columbia Gulf Agreement, and Rover Agreement (each as defined below and together, the "Firm Transportation Agreements") with Rockies Express Pipeline, LLC ("REX"), ANR Pipeline Company ("ANR"), Columbia Gas Transmission, LLC ("Columbia Gas") and Columbia Gulf Transmission, LLC ("Columbia Gulf" and together with Columbia Gas and ANR, the "TC Energy Pipelines"), and Rover Pipeline LLC ("Rover")[2] (collectively,

---

[2]     In addition, Gulfport has entered into a firm transportation agreement with Midship Pipeline Company, LLC ("Midship"). As of the date hereof, Gulfport has not moved to reject this agreement with Midship, which is also the subject of the FERC orders at issue.

the "Counterparties").  *In re Mirant Corp.*, 378 F.3d 511, 522 (5th Cir. 2004) ("A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given full effect when determining the breach of contract damages resulting from the rejection.  Further, there is nothing within the Bankruptcy Code itself that limits a [debtor's] ability to choose to reject an executory contract subject to FERC regulation as part of its reorganization process.").

3.      The Firm Transportation Agreements epitomize the sort of obligations from which the Bankruptcy Code is designed to provide relief.  The Debtors have paid hundreds of millions of dollars for transportation use under the Firm Transportation Agreements.  But the pricing environment for oil and gas production and the Debtors' financial condition when the Firm Transportation Agreements were executed were materially different than they are today.  Due to the well-documented decline in commodity pricing for oil and gas, it is no longer economical to maintain the Firm Transportation Agreements, which obligate the Debtors to pay hundreds of millions of dollars in aggregate gross costs through their remaining terms for capacity that will not be used pursuant to the Debtors' go-forward business plan.

4.      Notwithstanding clear and controlling law and plainly applicable facts, FERC has made clear its position that rejection of a FERC-jurisdictional executory contract in bankruptcy abrogates or modifies the rates of that contract and that FERC has ultimate authority to pass judgment on the modification or abrogation of the rates in a FERC-jurisdictional contract through rejection in bankruptcy.  Injunctive relief is necessary to stop FERC, which already has issued orders and thus taken steps that threaten to usurp this Court's jurisdiction over any rejection motions and, in turn, impair Gulfport's prospects for successful reorganization.

5.     Between September 15 and 22, 2020—without advanced notice to the Debtors—each of the Counterparties filed a Petition for Declaratory Order and Request for Expedited Action with FERC, requesting a declaratory judgment that "[a]ny bankruptcy reorganization plan or other action in a bankruptcy proceeding that purports to authorize the modification or rejection" of each of their respective FERC-jurisdictional contracts with Debtors "cannot be confirmed unless and until the Commission agrees, or the plan or other such action is made contingent on Commission approval."[3]  The Counterparties requested *expedited* action from FERC, citing their anticipation that Gulfport would file for bankruptcy protection and thereafter move the Court for approval of the rejections of the Firm Transportation Agreements.[4]

6.     In response, FERC issued separate orders initiating the requested proceedings and establishing as the intervention deadlines October 25, 2020 for the REX Petition, and November 4, 2020 for the Midship Petition, TC Energy Petition, and Rover Petitions.[5]  FERC made no effort

---

[3]     Petition for Declaratory Order and Request for Expedited Action of Midship Pipeline Company, LLC, dated September 21, 2020, FERC Dkt. No. RP20-1202-000 (the "Midship Petition"), attached as **Exhibit A**, at 5–6 ¶ 3. *See* Petition for Declaratory Order and Request for Expedited Action of Rockies Express Pipeline LLC, Rockies Express Pipeline LLC, FERC Dkt. No. RP20-1195-000 (filed Sept. 15, 2020) (the "REX Petition"), attached as **Exhibit B**, at 7 (requesting that FERC rule that Debtors' contract "cannot be abrogated or modified absent a public interest finding by the Commission"); Petition for Declaratory Order, Motion for Shortened Comment Period, and Request for Expedited Action of the TC Energy Pipelines, *ANR Pipeline Co., Columbia Gas Transmission, LLC, Columbia Gulf Transmission, LLC*, FERC Dkt. No. RP20-1204-000 (filed Sept. 21, 2020) (the "TC Energy Petition"), attached as **Exhibit C**, at 16; ("The Commission should declare that Gulfport must obtain authorization from the Commission in order to modify or abrogate the Gulfport FTSAs, regardless of whether it seeks to reject the contracts in bankruptcy."); Petition for Declaratory Order and Request for Expedited Action of Rover Pipeline LLC, *Rover Pipeline LLC*, Dkt. No. RP20-1206-000 (filed Sept. 22, 2020), (the "Rover Petition"), attached as **Exhibit D**, at 7 (requesting that FERC rule that "Gulfport must obtain the Commission's approval to abrogate, modify, or amend the filed rate . . . including if Gulfport seeks to abrogate, modify, or amend the filed rate by rejecting such Commission-jurisdictional agreements in bankruptcy court.").

[4]     REX Petition at 20; Midship Petition at 15; TC Energy Petition at 3, 14; Rover Petition at 17–18.

[5]     *Rockies Express Pipeline LLC*, Order on Petition for Declaratory Order, 172 FERC ¶ 61,279 (2020) ("REX Order I"), attached as **Exhibit E**, at 15 ¶ 25; *Rockies Express Pipeline LLC*, Errata Notice, FERC Dkt. No. RP20-1220-000, Oct. 6, 2020, attached as **Exhibit F**; *Midship Pipeline LLC*, Order on Petition for Declaratory Order, 173 FERC ¶ 61,011 (2020) ("Midship Order I"), attached as **Exhibit G**, at 16 ¶ 32; *Midship Pipeline LLC*, Errata Notice, FERC Dkt. No. RP20-1237-000, Oct. 6, 2020, attached as **Exhibit H**; *ANR Pipeline Co., Columbia Gas Transmission, LLC, Columbia Gulf Transmission, LLC*, Order on Petition for Declaratory Order, 173 FERC ¶ 61,018 (2020) ("TC Energy Order I", attached as **Exhibit I**, at 14 ¶ 25; *ANR Pipeline Co., Columbia Gas*

to hide that it instituted the proceedings and promised expedited action in an effort to "race to the courthouse" given FERC's concern that, if a chapter 11 case were commenced, its actions would be stayed under section 362 or enjoined. *See, e.g.*, *Rockies Express Pipeline LLC* (Order on Petition for Declaratory Order), 172 FERC ¶ 61,279 (2020), at 17 ¶ 30 ("Requiring Rockies Express to wait to come to the Commission until that bankruptcy filing is made would place Rockies Express in an untenable position, as it would face the possibility of a bankruptcy court-ordered stay preventing Rockies Express from asking the Commission to conduct any assessment on the contracts at issue. . . . If Rockies Express wants a Commission ruling on the Gulfport TSAs, which the pipeline is entitled to seek under our precedent, then it is prudent to begin proceedings now."). FERC made clear that it purports to have ultimate authority over approval of rejection of executory contracts on the asserted ground that rejection modifies or abrogates filed rates and FERC must approve rate modifications. *See, e.g.*, *Midship Pipeline LLC*, 173 FERC ¶ 61,011 (2020), at 15 ¶ 30 (Order on Petition for Declaratory Order,) (holding "any bankruptcy reorganization plan or other action in a bankruptcy proceeding that purports to authorize the modification *or rejection* of the Agreement cannot be confirmed unless and until the Commission agrees, or the plan or other such action is made contingent on Commission approval, as reflected in a Commission order") (emphasis added). FERC took this position notwithstanding established precedent establishing that rejection is "not a collateral attack" on FERC-jurisdictional rates. *In re Mirant Corp.*, 378 F.3d at 522.

---

*Transmission, LLC, Columbia Gulf Transmission, LLC*, Notice of Initiation of Section 5 Proceeding, FERC Dkt. No. RP20-1236-000, attached as **Exhibit J**, at 1; *Rover Pipeline LLC*, Order on Petition for Declaratory Order, 173 FERC ¶ 61,019 (2020) ("Rover Order I"), attached as **Exhibit K**, at 14 ¶ 23; *Rover Pipeline LLC*, Notice of Initiation of Section 5 Proceeding, FERC Dkt. No. RP20-1233-000, attached as **Exhibit L**, at 1.

7.     The rulings by FERC requiring Gulfport to obtain FERC's approval—in addition to this Court's approval—to reject the Firm Transportation Agreements threaten to usurp this Court's exclusive jurisdiction to authorize rejection of executory contracts under the Bankruptcy Code, as confirmed by the Fifth Circuit in *Mirant. See also In re Ultra*, No. 20-32631 (MI) (Bankr. S.D. Tex. Aug. 21, 2020) [Dkt. No. 721].

8.     The procedural delay alone threatens irreparable harm to Gulfport's estate.  Were FERC to go further, and issue an order compelling Gulfport to continue performing under the Firm Transportation Agreements or providing that Gulfport must *assume* the Firm Transportation Agreements in bankruptcy, Gulfport could be forced to challenge any such order exclusively in a Court of Appeals (under the statutory framework of the Natural Gas Act (15 U.S.C. § 717, the "NGA")).  This sort of jurisdictional confusion and resulting delay threatens per se and de facto irreparable harm.

9.     In light of the foregoing, Gulfport seeks a declaratory judgment confirming that rejection of the Firm Transportation Agreements constitutes breach (as opposed to modification or abrogation of the Firm Transportation Agreements) and that this Court has exclusive jurisdiction to determine the Debtors' right to reject the Firm Transportation Agreements under section 365 of the Bankruptcy Code—which FERC cannot preempt or veto acting under the NGA.  Gulfport also seeks to enjoin FERC from issuing or enforcing any order or ruling under the NGA that (a) might interfere with this Court's exclusive jurisdiction to decide any motion to reject that has been or may be brought, (b) may hinder the Court's ability to administer the reorganization of the Debtors' estates, or (c) purports to enforce or compel performance of obligations of the Debtors under any contract for which rejection is approved by this Court.   Any loss of jurisdiction, or competing and confusing rulings from FERC acting under the NGA, would irreparably harm Gulfport's prospects

for reorganization under the Bankruptcy Code and, derivatively, threaten injury upon all of Gulfport's stakeholders, including its creditors, employees, and business counterparties. Gulfport thus requests a ruling on its requested injunctive relief as soon as this Court's schedule will allow.

**Parties and Jurisdiction**

10.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

11.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The plaintiffs in this adversary proceeding are the Debtors in the underlying bankruptcy cases. On November 13, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 14, 2020, the Court entered an order [Docket No. 4] authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. No statutory committees have been appointed. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

13.     The Defendant in this adversary proceeding is FERC.

14.     The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1947 (2015).

**Facts**

15.     The Debtors are an independent returns-orientated, gas-weighted, exploration and development company and one of the largest producers of natural gas in the contiguous United States.  The Debtors hold significant acreage positions in the Utica Shale of Eastern Ohio and the SCOOP Woodford and SCOOP Springer plays in Oklahoma.  Headquartered in Oklahoma City, Oklahoma, the Debtors have approximately 259 employees.  The Debtors' operating revenue for the twelve-month period that ended September 30, 2020 was approximately $1.35 billion, and, as of the Petition Date, the Debtors have approximately $2.41 billion in total funded debt obligations.

**I.      Agreements.**

16.     Gulfport is a party to certain negotiated rate firm natural gas transportation service agreements, including (a) the REX Agreements, (b) the Midship Agreements, (c) the ANR Agreements, (d) the Columbia Gas Agreement, (e) the Columbia Gulf Agreements, and (f) the Rover Agreement (each as defined below and together, the "Firm Transportation Agreements"), with (i) REX, (ii) Midship, (iii) the TC Energy Pipelines, and (iv) Rover (collectively, the "FERC Contract Counterparties"), respectively, the rates and terms and conditions of which are subject to each FERC Contract Counterparty's applicable Federal Energy Regulatory Commission ("FERC") Gas Tariff (the "Tariff").   Each of the Firm Transportation Agreements includes maximum capacity reservations, pursuant to which Gulfport must render significant monthly payments, regardless of whether it actually ships any natural gas on the FERC Contract Counterparties' pipelines.

A.    **REX Agreements.**

17.    REX transports natural gas on the REX pipeline (the "REX Pipeline"), which is one of the largest natural gas pipelines in the United States and transports natural gas across North America between the Rocky Mountains and Appalachia.

18.    On September 24, 2014, Gulfport and REX entered into that certain firm transportation negotiated rate agreement providing for a maximum daily quantity ("MDQ") of 175,000 Dth per day for a term of twenty years.  In return, Gulfport agreed to pay a fixed negotiated rate of $15.2083 per Dth per month.  On March 1, 2015, the agreement was amended to increase the MDQ to 275,000 Dth per day for a term of twenty years.  On March 24, 2016 and November 14, 2016, Gulfport and REX entered into certain firm transportation service agreements providing for MDQs of 10,000 Dth and 40,000 Dth per day, respectively, for a term of fifteen years (collectively, the "REX Agreements").  In return, Gulfport agreed to pay fixed reservation rates of $16.72920 Dth per month and $13.68750 Dth per month, respectively.  Absent rejection, the Debtors estimate Gulfport will pay approximately $56 million in gross costs ($37 million in net costs) per year over the remaining life of the REX Agreements or approximately $825 million in gross costs ($550 million in net costs) in the aggregate for capacity that the Debtors deem unnecessary to their business.  The Debtors estimate that rejection of the REX Agreements will save the Debtors approximately $8 million in net savings on average per year over the life of the REX Agreements, and approximately $117 million in net savings over the remaining term of the REX Agreements.[6]

---

[6]    Net savings represents savings net to the Debtors and assumes strip pricing and differentials as of November 6, 2020.

### B.      Midship Agreements.

19.      Midship, a wholly owned subsidiary of Midship Holdings, LLC, transports natural gas from the South Central Oklahoma Oil Province and the Sooner Trend Anadarko Basin Canadian and the Kingfisher gas plays in the Anadarko Basin in Oklahoma to existing natural gas pipelines near Bennington, Oklahoma, for subsequent transport to Gulf Coast and Southeast markets.  Gulfport is one of Midship's three foundation shippers.

20.      On March 15, 2017, Midship and Gulfport executed a Precedent Agreement for the transportation of natural gas.  The parties amended that agreement four times over the next three years.  On February 21, 2020, Gulfport and Midship entered into that certain firm transportation natural gas agreement providing for a MDQ of 300,000 Dth per day for a term of ten years (the "Midship Agreement").  In return, Gulfport agreed to pay a negotiated reservation rate during the initial rate period (May 1, 2020 through January 31, 2021) of $0.26 per Dth per day and of $0.35 Dth per day thereafter (February 1, 2021 through April 30, 2030).  On August 20, 2020, Midship and Gulfport executed an amendment to the Midship Agreement (the "Amended Midship Agreement," and together with the Midship Agreement, the "Midship Agreements").  The Amended Midship Agreement provides for the following MDQs: (a) 300,000 Dth per day from May 1, 2020 through September 30, 2020; (b) 225,000 Dth per day from October 1, 2020 through March 31, 2021; and (c) 250,000 Dth per day from April 1, 2021 through December 31, 2021.

### C.      TC Energy Pipelines Agreements.

21.      The Debtors have entered into multiple agreements with TC Energy Pipelines, including the ANR Agreements, Columbia Gas Agreement, and Columbia Gulf Agreements.

### 1.     ANR Agreements.

22.     ANR transports natural gas on the ANR pipeline (the "ANR Pipeline"), a natural gas pipeline which delivers natural gas from Texas, Oklahoma, and Louisiana to Wisconsin, Illinois, Ohio, and Michigan.  The ANR Pipeline forms one of the largest interstate natural gas pipeline systems in the United States.  ANR is a member of the TC Energy family of companies.

23.     On the following dates, Gulfport entered into certain firm transportation service agreements with ANR: (a) October 7, 2013; (b) October 30, 2013; (c) March 10, 2014; (d) April 29, 2014; and (e) February 28, 2019 (collectively, the "ANR Agreements").[7]  The ANR Agreements provide for MDQs ranging from 5,000 to 50,000 Dth per day, for an aggregate MDQ of 293,700 Dth per day.  In return, Gulfport agreed to pay certain fixed rates based on a zonal rate design, in which the rates for each agreement vary depending on the specific receipt and delivery points under each applicable agreement.  For each agreement, Gulfport is obligated to pay the applicable fixed reservation rate per month, regardless of whether Gulfport actually ships any natural gas on the ANR Pipeline.  Absent rejection, the Debtors estimate Gulfport will pay approximately $15 million in gross costs ($10 million in net costs) per year over the remaining life of the ANR Agreement or approximately $244 million in gross costs ($171 million in net costs) in the aggregate for capacity that the Debtors deem unnecessary to their business.  The Debtors estimate that rejection of the ANR Agreements will save the Debtors approximately $9 million in net savings on average per year over the lives of the ANR Agreements, and approximately $145 million in net savings over the remaining term of the ANR Agreements.[8]

---

[7]     *See* **Exhibit M** for further detail for each of the ANR Agreements.

[8]     Net savings represents savings net to the Debtors and assumes strip pricing and differentials as of November 6, 2020.

### 2.    Columbia Gas Agreement.

24.    Columbia Gas transports natural gas interstate along thousands of miles of pipeline that traverse ten states: Delaware, Kentucky, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Virginia, and West Virginia (the "Columbia Gas Pipeline").  Columbia Gas is a member of the TC Energy family.

25.    On June 1, 2016, Gulfport and Columbia Gas entered into that certain firm transportation natural gas agreement providing for a MDQ of 100,000 Dth per day (the "Columbia Gas Agreement").[9]  In return, Gulfport agreed to pay a negotiated rate pursuant to Columbia Gas's Rate Schedule FTS included in Columbia Gas's FERC Gas Tariff, Fourth Revised Volume No. 1. The Columbia Gas Agreement was entered into as part of Columbia Gas's Leach XPress project and filed with FERC as a negotiated rate contract.[10]  Absent rejection, the Debtors estimate Gulfport will pay approximately $22 million in gross costs ($15 million in net costs) per year over the remaining life of the Columbia Gas Agreement or approximately $267 million in gross costs ($181 million in net costs) in the aggregate for capacity that the Debtors deem unnecessary to their business.  The Debtors estimate that rejection of the Columbia Gas Agreement will save the Debtors approximately $14 million in net savings on average per year over the life of the Columbia Gas Agreement, and approximately $168 million in net savings over the remaining term of the Columbia Gas Agreement.[11]

---

[9]    The Columbia Gas Agreement was amended on April 30, 2018 to increase the Daily Demand Rate set forth in the Columbia Gas Agreement by $0.05 effective as of January 1, 2018.

[10]    *Columbia Gas Transmission, LLC*, Dkt. No. RP18-811-000, attached as **Exhibit N**. *See also* Columbia Tariff, § VIII.12.

[11]    Net savings represents savings net to the Debtors and assumes strip pricing and differentials as of November 6, 2020.

### 3.   Columbia Gulf Agreements.

26.     Columbia Gulf transports natural gas interstate between Louisiana and certain locations in northeastern Kentucky (the "Columbia Gulf Pipeline").  Columbia Gulf is a member of the TC Energy family.

27.     On July 9, 2015 and June 1, 2016, Gulfport and Columbia Gulf entered into that certain credit support agreement and that certain firm transportation natural gas agreement, respectively (collectively, the "Columbia Gulf Agreements").[12]  The Columbia Gulf Agreements provide for a MDQ of 100,000 Dth per day.  In return, Gulfport agreed to pay a negotiated reservation rate of $0.20 per Dth per day, in addition to certain other fees and surcharges.  The Columbia Gulf Agreements were entered into as part of Columbia Gulf's Rayne XPress project and filed with FERC as a negotiated rate contract.[13]  Absent rejection, the Debtors estimate Gulfport will pay approximately $8 million in gross costs ($5 million in net costs) per year over the remaining life of the Columbia Gulf Agreements or approximately $91 million in gross costs ($62 million in net costs) in the aggregate for capacity that the Debtors deem unnecessary to their business.  Although the Columbia Gulf Agreements are profitable by themselves, the natural gas must first be transported on the Columbia Gas Pipeline to reach the Columbia Gulf Pipeline.  Thus, the volumes of natural gas that eventually travel through the Columbia Gas Pipeline are burdened by both transport costs, which creates an uneconomic situation for the Debtors.

---

[12]   The Columbia Gulf Agreements were amended on multiple occasions to increase the amount of the standby letter of credit.

[13]   **Exhibit O**. *Columbia Gulf Transmission, LLC,* Dkt. No. RP17-1116-000. *See also* Columbia Gulf Tariff, § VIII.1.

###### D.       Rover Agreement.

28.       Rover transports natural gas on the Rover pipeline (the "Rover Pipeline"), a natural gas pipeline stretching from the Marcellus and Utica Shale production areas to the Midwest Hu near Defiance, Ohio.  Rover is a subsidiary of Energy Transfer LP ("Energy Transfer"), "one of the largest and most diversified investment-grade master limited partnerships in the United States."[14]  Gulfport is one of Rover's anchor shippers and, as such, has provided significant returns on investment to Rover and Energy Transfer.

29.       On February 24, 2017, Gulfport and Rover entered into a negotiated rate firm transportation natural gas agreement pursuant to the Rate Schedule FTS (the "Rover Agreement") with a current maximum daily quantity of natural gas ("MDQ") of 150,000 dekatherms ("Dth") per day.  In return, Gulfport agreed to pay a rate that varies by delivery point as follows:  (a) $0.82 per Dth per day for the portion of the MDQ with primary delivery points in the Market Zone South; (b) $0.75 per Dth per day for the portion of the MDQ with a primary delivery point at Dawn; and (c) $0.65 per Dth per day for the portion of the MDQ with a primary delivery point at the Rover/Vector interconnect or at the PEPL/Consumers (MGS) delivery point (each as defined in the Rover Agreement).  Absent rejection, the Debtors estimate Gulfport will pay approximately $39 million in gross costs ($26 million in net costs) per year over the remaining life of the Rover Agreement or approximately $447 million in gross costs ($304 million in net costs) in the aggregate for capacity that the Debtors deem unnecessary to their business.  The Debtors estimate that rejection of the Rover Agreement will save the Debtors approximately $10 million in net

---

[14]       *See* About Energy Transfer, https://www.energytransfer.com/about/.

savings on average per year over the life of the Rover Agreement, and approximately $105 million in net savings over the remaining term of the Rover Agreement.[15]

## II.    REX, Midship, TC Energy Pipelines, and Rover Initiated FERC Proceedings.

30.    REX, Midship, TC Energy Pipelines, and Rover filed similar petitions with FERC within a week of one another.  Anticipating Gulfport might file for bankruptcy, FERC granted the petitions and initiated expedited proceedings with the stated goal of issuing a ruling before the bankruptcy court exercised jurisdiction over the Debtors' estate.[16]  FERC was explicit in its desire to initiate expedited hearings, so that it could "issue an opinion prior to the potential imposition of a stay by a bankruptcy court."[17]

### A.    FERC Grants REX's Petition.

31.    On September 15, 2020, REX filed with FERC a Petition for Declaratory Order.[18] REX requested an expedited hearing on the *Mobile-Sierra*[19] public interest implications of continued performance under the REX-Gulfport agreements, asking for a three-week comment period.[20]  REX also requested that FERC declare it would have concurrent jurisdiction over the agreements if Gulfport filed for bankruptcy.

---

[15]    Net savings represents savings net to the Debtors and assumes strip pricing and differentials as of November 6, 2020.

[16]    **Exhibit E**, REX Order I, at 15 ¶ 25; **Exhibit G**, Midship Order I, at 16 ¶ 32; **Exhibit I**, TC Energy Order I, at 14 ¶ 25; **Exhibit K**, Rover Order I, at 14 ¶ 23.

[17]    *See* **Exhibit E**, REX Order I, at 18 ¶ 32.

[18]    **Exhibit B**, REX Petition.

[19]    *See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956) ("*Mobile*"); *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) ("*Sierra*").

[20]    **Exhibit B**, REX Petition at 3.

32.     In response, Gulfport filed a Motion to Intervene and Protest on September 21, 2020.[21]  Gulfport requested a 75-day comment period like FERC had provided in other debtors' proceedings.[22]

33.     On September 25, 2020, FERC granted both of REX's requests.[23]  FERC established a proceeding "to determine whether the public interest requires abrogation" of the REX-Gulfport agreements.[24]  FERC explained it granted the petition because it anticipated Gulfport might file for bankruptcy, as "there is 'substantial doubt' about Gulfport's ability to continue as a going concern.  Accordingly, uncertainty exists regarding the status of Rockies Express' three firm TSAs with Gulfport and the treatment of those Gulfport TSAs should Gulfport file for bankruptcy."[25]

34.     FERC set a short comment period because it sought to issue a final ruling before Gulfport could file for bankruptcy and invoke the bankruptcy court's jurisdiction.[26]  FERC noted, "Rockies Express states that recent experiences in other producer bankruptcy proceedings indicates that, if the Commission does not act promptly, it may be denied of means to exercise its jurisdiction and protect the public interest during the bankruptcy process."[27]  FERC concluded, "Given the interest in prompt action by the Commission . . . we find that a five-day comment

---

[21]   Motion to Intervene and Protest of Gulfport Energy Corporation, Dkt. No. RP20-1195-000 (filed Sept. 21, 2020).

[22]   *Id.* at 27.

[23]   **Exhibit E**, REX Order I; *Rockies Express Pipeline LLC*, Errata Notice, Dkt. No. RP20-1220-000 (Oct. 6, 2020).

[24]   **Exhibit E**, REX Order I, at 1 ¶ 1.

[25]   *Id.* at 16 ¶ 26.

[26]   *Id.* at 15 ¶ 25, 17 ¶ 30.

[27]   *Id.* at 3 ¶ 4.

period is sufficient."[28]   Removing any doubt that it intended to outrace Gulfport's potential bankruptcy filing, FERC reassured REX that it "anticipates [issuing] a final ruling within 14 days of the final submission by the parties."[29]

35.     Even though Gulfport had not filed for bankruptcy or even announced such an intent—the only evidence cited that Gulfport might file for bankruptcy was a going-concern qualification that had been included in Gulfport's Form 10-Q, which was filed over a month before REX's petition to FERC—FERC did not consider REX's petition premature.[30]   Rather, FERC acknowledged that it sought to avoid imposition of the automatic stay under section 362 and to act before it could be enjoined:  "Requiring Rockies Express to wait to come to the Commission until that bankruptcy filing is made would place Rockies Express in an untenable position, as it would face the possibility of a bankruptcy court-ordered stay preventing Rockies Express from asking the Commission to conduct any assessment on the contracts at issue."[31]   FERC noted that "this possibility is not merely hypothetical, as recent experience in other producer bankruptcy proceedings shows," citing the bankruptcy court's order denying relief from the automatic stay in *In re Ultra Petroleum Corp.*[32]   Therefore, FERC concluded, "If Rockies Express wants a

---

[28]   *Id.* at 15 ¶ 25.

[29]   *Id.* at 17 ¶ 29.

[30]   *Id.* at 17 ¶ 30.

[31]   *Id.*

[32]   *Id.* (citing *In re Ultra Petroleum Corp., et al.*, Case Nos. 20-32631, et al., (MI) (Dkt. No. 454) (Bankr. S.D. Tex. July 22, 2020) (Order Denying Motion for Relief from Stay)).

Commission ruling on the Gulfport TSAs, which the pipeline is entitled to seek under our precedent, then it is prudent to begin proceedings now," before any bankruptcy case started.[33]

36.     Despite its stated goal of ruling before a bankruptcy court could obtain jurisdiction over the rejection of the Firm Transportation Agreements, FERC insisted it "neither presumes to sit in judgment of rejection motions nor seeks to arrogate the role of adjudicating bankruptcy proceedings."[34]

37.     But FERC nonetheless sought to rule before a bankruptcy court could exercise jurisdiction because it recognized that FERC's actions, which are inextricably intertwined with contract rejection, were likely to be enjoined.  In initiating the proceeding, FERC emphasized that "Gulfport has publicly announced that, like many other shippers, it is experiencing serious financial distress during this period of unprecedented demand destruction."[35]

38.     FERC made clear that it purports to have concurrent jurisdiction under the NGA over the Debtors' contract obligations notwithstanding the Bankruptcy Court's exclusive jurisdiction over approval of rejection of executory contracts under the Bankruptcy Code:  "We also hold that if Gulfport were to file for bankruptcy, the Commission will have concurrent jurisdiction . . . with the U.S. Bankruptcy Court" with respect to the REX-Gulfport agreements, under the Natural Gas Act (NGA), §§ 4–5.[36]

---

[33]   *Id.*

[34]   *Id.* at 18 ¶ 31.

[35]   *Id.* at 19 ¶ 33.

[36]   *Id.*

B.      **FERC Grants Midship's Petition.**

39.      Midship filed a Petition for Declaratory Order with FERC on September 21, 2020.[37]
Midship requested expedited action and asked FERC to grant the Petition "as soon as possible,"
as it had in *Rockies Express*.[38]  In response, Gulfport filed a Motion to Intervene and Protest on
September 28, 2020.[39]

40.      FERC took the same position as in *Rockies Express*.[40]  It denied Gulfport's request
for a comment period longer than three weeks, explaining that FERC's "position has not
changed."[41]  FERC has not been shy about its efforts to establish its purported jurisdiction over
rejection of the Firm Transportation Agreements.  Seeking to issue a ruling before the bankruptcy
court could obtain jurisdiction, FERC found it "prudent . . . to initiate that hearing immediately
consistent with the Commission's recent holding in *Rockies Express*."[42]

41.      Gulfport's potential bankruptcy did not merely motivate FERC to expedite its
proceedings—the specter of bankruptcy convinced FERC to establish proceedings that it would
not otherwise have initiated.  FERC granted Midship's petition because "there is 'substantial
doubt' about Gulfport's ability to continue as a going concern.  Accordingly, uncertainty exists
regarding the status of the Agreement and the treatment of the Agreement should Gulfport file for

---

[37]   **Exhibit A**, Midship Petition.

[38]   *Id.* at 2.

[39]   Motion to Intervene and Protest of Gulfport Energy Corporation, Dkt. No. RP20-1202-000 (filed Sept. 28, 2020).

[40]   **Exhibit G**, Midship Order I; *see* **Exhibit E**, REX Order I.

[41]   **Exhibit E**, REX Order I, at 14 ¶ 27.

[42]   *Id.* at 16 ¶ 32.

bankruptcy."[43]   Just as in *Rockies Express*, FERC explained that "to the extent a bankruptcy proceeding concerning the Agreement is initiated in the near future, holding an evidentiary hearing now will allow the Commission to issue an opinion prior to the potential imposition of a stay by a bankruptcy court."[44]   FERC claimed it "should investigate" Gulfport's "level of financial distress . . . to determine whether further injury to Gulfport, Midship, the consuming public, or the industry can be avoided or mitigated."[45]   Like in *Rockies Express*, FERC insisted it has concurrent jurisdiction over the Debtors' contract obligations notwithstanding a bankruptcy court's exclusive jurisdiction over approval of rejection of executory contracts:  "Therefore, we hold that if Gulfport were to file for bankruptcy, the Commission will have concurrent jurisdiction . . . with the United States Bankruptcy Court with respect to the Agreement," under the Natural Gas Act (NGA), §§ 4–5.[46]

42.    Importantly, FERC staked out its untenable position that it has ultimate authority over approval of rejection of a contract, holding that "any bankruptcy reorganization plan or other action in a bankruptcy proceeding that purports to authorize the modification *or rejection* of the Agreement cannot be confirmed unless and until the Commission agrees, or the plan or other such action is made contingent on Commission approval, as reflected in a Commission order."[47] Notwithstanding *Mirant*'s holding that rejection of a FERC jurisdictional executory contract constitutes breach of the contract and is not a collateral attack on the filed rate in the contract,

---

[43]    *Id.* at 14 ¶ 28.

[44]    *Id.* at 16 ¶ 34.

[45]    *Id.* at 16 ¶ 33.

[46]    *Id.* at 14–15 ¶ 29.

[47]    *Id.* at 15 ¶ 30 (emphasis added).

FERC contended that the Bankruptcy Code imposes this requirement because "[t]he court shall confirm a plan only if all of the following requirements are met: . . . Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[48]

### C.   FERC Grants TC Energy Pipelines' Petition.

43.     ANR, Columbia Gas, and Columbia Gulf filed a Petition for Declaratory Order with FERC on September 21, 2020.[49]  TC Energy Pipelines sought "substantially the same relief" as REX.[50]  In response, Gulfport filed a Motion to Intervene and Protest on September 29, 2020.[51]

44.     FERC took the same position as in *Rockies Express* and *Midship Pipeline*.[52] It denied Gulfport's request for a comment period longer than three weeks, explaining that "our position has not changed."[53]  FERC granted TC Energy Pipelines' petition and established a proceeding for identical reasons as in *Midship Pipeline*.[54]  FERC repeated its justification from *Rockies Express* and *Midship Pipeline* that it might change the filed rates and "prevent the need for a bankruptcy proceeding at all."[55]

---

[48]   *Id.* at 15 ¶ 30 n.84 (quoting *ETC Tiger Pipeline, LLC*, 171 FERC ¶ 61,248 at 22 n.25 (2020) (quoting 11 U.S.C. § 1129(a)(6))).

[49]   **Exhibit C**, TC Energy Petition.

[50]   *Id.* at 3 n.7.

[51]   Motion to Intervene and Protest of Gulfport Energy Corporation, Dkt. No. RP20-1204-000 (filed Sept. 29, 2020).

[52]   **Exhibit I**, TC Energy Order I; *see* **Exhibit E**, REX Order I; **Exhibit G**, Midship Order I.

[53]   **Exhibit I**, TC Energy Order I, at 14 ¶ 25.

[54]   *Compare id., with* **Exhibit G**, Midship Order I, at 14 ¶ 28.

[55]   **Exhibit I**, TC Energy Order I, at 18 ¶ 35.

45.     Just as in *Rockies Express* and *Midship Pipeline*, FERC made clear that it purports to have concurrent jurisdiction over the Debtors' contract obligations notwithstanding a bankruptcy court's exclusive jurisdiction over approval of rejection of executory contracts: "Therefore, we hold that if Gulfport were to file for bankruptcy, the Commission will have concurrent jurisdiction . . . with the United States Bankruptcy Court with respect to the Agreement," under the Natural Gas Act (NGA), §§ 4–5.[56]  In *TC Energy*, FERC went one step further, stating contrary to *Mirant* that the "rejection of a Commission-jurisdictional contract in bankruptcy court alters the essential terms and conditions of a contract that is also a filed rate; therefore, the Commission's approval is required to modify or abrogate the filed rate."[57]  In claiming that FERC approval is required, FERC wrongly purports to sit in judgment upon the bankruptcy court approval of executory contract rejection.

46.     As in *Midship Pipeline*, FERC likewise purported to assert ultimate authority to approve rejection of an executory contract by "reiterat[ing] that any bankruptcy reorganization plan or other action in a bankruptcy proceeding that purports to authorize the modification *or rejection* of the Gulfport TSAs cannot be confirmed unless and until the Commission agrees, or the plan or other such action is made contingent on Commission approval, as reflected in a Commission order."[58]  But *Mirant* squarely rejected this notion that rejection constitutes a collateral attack on the filed rate.

---

[56]   *Id.* at 14–15 ¶ 29.

[57]   *Id.* at 15 ¶ 29.

[58]   *Id.* at 15 ¶ 28 (emphasis added).

### D.    FERC Grants Rover's Petition.

47.    Rover Pipeline Company LLC ("Rover") filed a Petition for Declaratory Order and Request for Expedited Action with FERC on September 22, 2020.[59]  In response, Gulfport filed a Motion to Intervene and Protest on September 29, 2020.[60]

48.    FERC took the same position as in *Rockies Express*, *Midship Pipeline*, and *TC Energy Pipelines*.[61]  It denied Gulfport's request for a comment period longer than three weeks, explaining that "our position has not changed."[62]  FERC granted Rover's petition and established a proceeding for identical reasons as in *Midship Pipeline*.[63]

49.    As in *Rockies Express*, *Midship Pipeline*, and *TC Energy Pipelines*, FERC made clear that it purports to have concurrent jurisdiction over the Debtors' contract obligations notwithstanding a bankruptcy court's exclusive jurisdiction over approval of rejection of executory contracts:   if "Gulfport were to file for bankruptcy, the Commission will have concurrent jurisdiction . . . with the U.S. Bankruptcy Court with respect to the" Rover-Gulfport agreement, under the Natural Gas Act (NGA), §§ 4–5.[64]  Importantly, just as in *TC Energy Pipelines*, FERC stated again contrary to *Mirant* that the "rejection of a Commission-jurisdictional contract in bankruptcy court alters the essential terms and conditions of a contract that is also a filed rate;

---

[59]    **Exhibit D**, Rover Petition.

[60]    Motion to Intervene and Protest of Gulfport Energy Corporation, Dkt. No. RP20-1206-000 (filed Sept. 29, 2020).

[61]    **Exhibit K**, Rover Order I; *see* **Exhibit E**, REX Order I; **Exhibit G**, Midship Energy Order I; **Exhibit I**, TC Energy Order I.

[62]    **Exhibit K**, Rover Order I, at 14 ¶ 23.

[63]    *Compare id., with* **Exhibit G**, Midship Order I, at 14 ¶ 28.

[64]    *Id.*

therefore, the Commission's approval is required to modify or abrogate the filed rate."[65]   Again, FERC thus wrongly posited that it is the ultimate arbiter that may judge bankruptcy court approval of contract rejection.

50.     And just as in *Midship Pipeline* and *TC Energy Pipelines*, FERC asserted this ultimate authority over contract rejection by "reiterat[ing] that any bankruptcy reorganization plan or other action in a bankruptcy proceeding that purports to authorize the modification *or rejection* of the Gulfport TSAs cannot be confirmed unless and until the Commission agrees, or the plan or other such action is made contingent on Commission approval, as reflected in a Commission order."[66]   Yet again FERC ignored *Mirant*'s holding that rejection does not constitute a collateral attack on the filed rate.

E.     **FERC Ruled the Public Interest Does Not Require that the Firm Transportation Agreements Be Abrogated or Modified.**

51.     FERC issued orders and rulings on all four FERC paper hearings in late October and early November 2020, concluding that public interest did not support abrogating or modifying the Firm Transportation Agreements.[67]   FERC reiterated that its proceedings were relevant to its role in examining the public interest under *Mobile-Sierra*, quoting its past rulings that "it is entirely possible that the Commission may conclude that a change to the filed rates at issue in this

---

[65]   *Id.* at 14–15 ¶ 25.

[66]   *Id.* at 15 ¶ 26 (emphasis added).

[67]   *Rockies Express Pipeline LLC*, Order on Paper Hearing, 173 FERC ¶ 61,099 (Oct. 28, 2020) ("REX Order II"), at 31; *Midship Pipeline LLC*, Order on Paper Hearing, 173 FERC ¶ 61,130 (Nov. 6, 2020) ("Midship Order II"), attached as **Exhibit P**, at 27; *ANR Pipeline Co., Columbia Gas Transmission, LLC, Columbia Gulf Transmission, LLC*, Order on Paper Hearing, 173 FERC ¶ 61,131 (Nov. 9, 2020) ("TC Energy Order II"), attached as **Exhibit Q**, at 26; *Rover Pipeline LLC*, Order on Paper Hearing, 173 FERC ¶ 61,133 (Nov. 9, 2020) ("Rover Order II"), attached as **Exhibit R**, at 31.

proceeding is required to avoid serious harm to the public interest."[68]  FERC noted, "If so, then the Commission, unlike a bankruptcy court, has the authority and expertise to modify the filed rates in a manner that may prevent the need for a bankruptcy proceeding at all."[69]  However, despite this justification for exerting jurisdiction over the Firm Transportation Agreements, FERC found that "the public interest does not presently require the modification or abrogation of the Gulfport TSAs under the *Mobile-Sierra* standard."[70]  For each Firm Transportation Agreement, FERC held that "the Agreement as currently on file and in effect remains just and reasonable," prohibiting modification or abrogation.[71]

52.     FERC rejected the Debtors' arguments in the paper hearing, noting that Debtors argued that "the Mobile-Sierra standard applies to modifying or abrogating contracts, while the rejection of a contract in bankruptcy is neither of those" because rejection in bankruptcy "is akin to a breach, not a rescission."[72]  FERC also noted the Debtors' arguments that the FERC paper hearings were a violation of due process, undermine the Bankruptcy Code and constitute "jurisdictional overreach" that invades the jurisdiction of the bankruptcy court.[73]  However, FERC stated, "We disagree with Gulfport's arguments and with its characterizations of this process and the Commission's role in bankruptcy proceedings," implying that any rejection of the Firm

---

[68]  *E.g.,* **Exhibit R**, Rover Order II, at ¶ 68.

[69]  *Id.*

[70]  **Exhibit R**, Rover Order II, at 31; **Exhibit Q**, TC Energy Order II, at 26; *see* **Exhibit P**, Midship Order II, at 27;

[71]  *E.g.,* **Exhibit R**, Rover Order II, at ¶ 14.

[72]  *E.g.,* **Exhibit R**, Rover Order II, at ¶ 65.

[73]  **Exhibit R**, Rover Order II, at ¶¶ 66–67; **Exhibit Q**, TC Energy Order II, at ¶ 53; *see* **Exhibit P**, Midship Order II, at ¶ 73.

Transportation Agreements in bankruptcy would be impermissible without FERC approval under the NGA of a supposed modification or abrogation of the FERC-filed rates in the Firm Transportation Agreements rejected under the Bankruptcy Code.[74]

53.     FERC also emphasized that it needed "to issue an opinion prior to the potential imposition of a stay by a bankruptcy court,"[75] quoting its past orders.  FERC reiterated that the opportunity to provide input to the bankruptcy court by filing briefs during a bankruptcy proceeding was insufficient because "the Commission is a deliberative body that speaks through its orders."[76]

54.     FERC denied rehearing for all four paper hearings on November 12, 2020.[77]  FERC disagreed with Gulfport's argument that its paper hearing orders were "unlawfully premature or administratively imprudent."[78]  FERC reiterated its view that "the Commission needed to act prior to a bankruptcy filing in order to avoid the potential imposition of a stay by a bankruptcy court that could prevent the Commission from opining on the potential abrogation of the" Agreements.[79]

---

[74]  **Exhibit R**, Rover Order II, at ¶ 67; **Exhibit Q**, TC Energy Order II, at ¶ 53; **Exhibit P**, Midship Order II, at ¶ 74.

[75]  **Exhibit R**, Rover Order II, at ¶ 67; **Exhibit Q**, TC Energy Order II, at ¶ 53; **Exhibit P**, Midship Order II, at ¶ 74.

[76]  **Exhibit R**, Rover Order II, at ¶ 67; **Exhibit Q**, TC Energy Order II, at ¶ 53; **Exhibit P**, Midship Order II, at ¶ 74.

[77]  *Rockies Express Pipeline LLC*, Order Denying Rehearing, 172 FERC ¶ 61,135 (2020) ("REX Order III"), attached as **Exhibit S**, at 1 ¶ 1; *Midship Pipeline LLC*, Order Denying Rehearing, 173 FERC ¶ 61,136 (2020) ("Midship Order III"), attached as **Exhibit T**, at 1 ¶ 1; *ANR Pipeline Co., Columbia Gas Transmission, LLC, Columbia Gulf Transmission, LLC*, Order Denying Rehearing, 173 FERC ¶ 61,137 (2020) ("TC Energy Order III", attached as **Exhibit U**, at 1 ¶ 1; *Rover Pipeline LLC*, Order Denying Rehearing, 173 FERC ¶ 61,138 (2020) ("Rover Order III"), attached as **Exhibit V**, at 11 ¶ 1.

[78]  **Exhibit S**, REX Order III, at 5 ¶ 13; **Exhibit T**, Midship Order III, at 7 ¶ 15; **Exhibit U**, TC Energy Order III, at 5 ¶ 13; **Exhibit V**, Rover Order III, at 6 ¶ 13.

[79]  **Exhibit S**, REX Order III, at 5–6 ¶ 13; **Exhibit T**, Midship Order III, at 7 ¶ 15; **Exhibit U**, TC Energy Order III, at 5–6 ¶ 13; **Exhibit V**, Rover Order III, at 6 ¶ 13.

FERC also disagreed with Gulfport's argument "that the Commission has infringed on the jurisdiction of the bankruptcy courts in granting the petition."[80]

55.     Injunctive relief against FERC is especially necessary here given that FERC appears to be taking the position that the Debtors cannot even request the bankruptcy court's permission to reject the agreements by ruling that: (1) rejection of FERC-jurisdictional contracts constitutes modification or abrogation of the FERC-filed rates in the Firm Transportation Agreements; (2) FERC has exclusive jurisdiction over modification or abrogation of FERC-filed rates in FERC-jurisdictional contracts; and (3) the public interest does not require modification or abrogation of the FERC-filed rates in the Firm Transportation Agreements.

## III.    The Debtors' Decision to Reject the Firm Transportation Agreements.

56.     In the period leading up to the Petition Date, the Debtors analyzed their executory contracts and unexpired leases, including the Firm Transportation Agreements.  As a result of this analysis, the Debtors have determined that, in their business judgment, certain of the Firm Transportation Agreements are unnecessary and burdensome to the Debtors' estates.  The Debtors are moving to reject those Firm Transportation Agreements because, in their business judgment, they are unnecessary and burdensome to the Debtors' estates, and it is in the best interests of their estates to reject them.

57.     The Firm Transportation Agreements are exactly the sort of burdensome obligations that sections 365 and 1141(d) of the Bankruptcy Code are designed to address.  The Debtors have paid hundreds of millions of dollars for transportation use under the Firm Transportation Agreements.  But the pricing environment for oil and gas production and the

---

[80]     **Exhibit S**, REX Order III, at 7 ¶ 17; **Exhibit T**, Midship Order III, at 8 ¶ 19; **Exhibit U**, TC Energy Order III, at 7 ¶ 17; **Exhibit V**, Rover Order III, at 7 ¶ 17.

Debtors' financial condition when the Firm Transportation Agreements were executed were materially different than they are today.  Due to the well-documented decline in commodity pricing for oil and gas, it is no longer economical to maintain the Firm Transportation Agreements, which obligate the Debtors to pay over $1 billion in aggregate gross costs through their remaining terms for capacity that is not necessary to the Debtors' operations.

58.     But the Debtors have concern that without injunctive relief FERC might argue that moving to reject the Firm Transportation Agreements violates the recent FERC orders and FERC could take enforcement action against the Debtors.

### The Necessity of this Adversary Proceeding

59.     "The authority to reject an executory contract is vital to the basic purpose of a chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."  *Mirant*, 378 F. 3d at 517 (brackets and internal quotations omitted).  The Bankruptcy Code provides a debtor the right to make assumption and rejection decisions "at any time before the confirmation of a plan."  11 U.S.C. § 365(d)(2).  Due to the economic burden that the Firm Transportation Agreements impose on Gulfport, Gulfport's rejection under section 365 will play a vital role in the reorganized Debtors' post-emergence financial and operational condition.  As such, the Court's consideration of any rejection motions is vital to the Debtors' successful reorganization.

60.     The FERC purports to have authority under the NGA to approve rejection of executory contracts that contain FERC-jurisdictional rates in contravention of section 365 of the Bankruptcy Code and binding Fifth Circuit precedent.  Absent the relief sought herein, FERC could take action issuing or enforcing orders under the NGA that could very well deprive Gulfport of its right to avail itself of the relief provided under the Bankruptcy Code, including its statutory

right to seek to reject the Firm Transportation Agreements after evaluation in the context of their

ongoing business operations, as contemplated by section 365 of the Bankruptcy Code.

**Basis for Relief**

**I.     The Court Should Enjoin FERC From Preempting or Negating the Court's Exclusive Jurisdiction Over Any Rejection Motions Under Section 105 of the Bankruptcy Code.**

61.     This Court should enjoin FERC under section 105 of the Bankruptcy Code from

any attempt to preempt, prevent, negate, or otherwise act under the NGA to interfere with the

Court's decision on any motion that may be filed by the Debtors seeking to reject one or more of

their FERC-governed executory contracts.  This includes any effort by FERC to enforce its orders,

already issued under the NGA in a manner that would preclude Debtors from rejecting the Firm

Transportation Agreements in bankruptcy, and any effort by FERC to compel the Debtors'

performance under the Firm Transportation Agreements.  Section 105 allows the Court to issue

any order "that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code—

including section 365.  *Mirant*, 378 F.3d at 523 ("[A] bankruptcy court can clearly grant injunctive

relief [pursuant to section 105] to prohibit FERC from negating [debtor's] rejection by requiring

continued performance at the pre-rejection filed rate."); *In re Diaz*, 526 B.R. 685, 694 (Bankr. S.D.

Tex. 2015) ("The Fifth Circuit has recognized that § 105(a) grants bankruptcy courts the authority

to grant injunctive relief.").  Bankruptcy courts have broad authority and considerable discretion

under this provision.  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007).

62.     Bankruptcy courts can stay actions under section 105 where a stay is necessary to

prevent "an impermissible dilution of federal bankruptcy policy."  *Penn Terra Ltd. v. Dep't of

Envt'l. Res.*, 733 F.2d 267, 274 (3d Cir. 1984).  Numerous courts have enjoined federal and state

regulatory actions where those actions threatened to disrupt the reorganization process.  *See, e.g.*,

*N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d 695, 699 (8th Cir. 1985) (affirming issuance of

section 105 injunction against National Labor Relations Board); *Global Land, Inc. v. Mayor (In re Karta Corp.)*, 296 B.R. 305 (S.D.N.Y. 2003) (enjoining local municipality); *Gumport v. Interstate Com. Comm'n (In re Transcon Lines)*, 147 B.R. 770 (Bankr. C.D. Cal. 1992) (enjoining Interstate Commerce Commission).

63.     Injunctive relief "granted pursuant to section 105 must be tested against the standards of Rule 65 [of the] Federal Rules of Civil Procedure, which is made expressly applicable to the bankruptcy proceedings via Rule 7065 of the Bankruptcy Rules." *In re Tribeca Lofts LP*, No. 10-40799, 2011 WL 3878369, at *2 (Bankr. S.D. Tex. Aug. 30, 2011) (quoting *Continental Air Lines v. Hillblom*, 61 B.R. 758, 781 (S.D. Tex. 1986)).  In order to issue an injunction, the bankruptcy court must find "[1] irreparable injury would result to the movant in its absence, [2] that the threatened injury to the movant outweighs the harm that the injunction may cause to the nonmovant, [3] that there is a likelihood of success on the merits, and [4] that the public interest would not be adversely affected by the injunction . . . ." *Id.* at *2 (quoting *Holland America Ins. Co. v. Roy,* 777 F.2d 992, 997 (5th Cir. 1985)).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Jonibach Mgmt. Tr. v. Wartburg Enter., Inc.*, 750 F.3d 486, 491 (5th Cir. 2014) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

64.     Consistent with *Mirant's* endorsement of bankruptcy court injunctions narrowly tailored to "protect[] [a debtor's] right to reject executory contracts," 378 F.3d at 524, courts elsewhere have "established a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process *or which would impair the court's jurisdiction with respect to a case before it*." *Alert Holdings, Inc. v. Interstate Protective Servs. Inc.*, 148 B.R. 194, 200

(Bankr. S.D.N.Y. 1992) (emphasis added); *see also In re Chateaugay Corp.*, *Reomar, Inc.*, 93 B.R. 26, 29 (S.D.N.Y. 1988) ("The usual grounds for injunctive relief such as irreparable injury need not be shown in a proceeding for an injunction under section 105(a)," when the parallel proceeding "would defeat or impair [the bankruptcy court's] jurisdiction with respect to a case before it."); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987).

### A.    Gulfport Has A Strong Likelihood Of Success On The Merits.

65.    Gulfport has a strong likelihood of success on its claims for declaratory and injunctive relief against FERC.  Indeed, the Fifth Circuit has already resolved this issue, holding that this Court's jurisdiction over the putative rejection of FERC-jurisdictional executory contracts is unimpaired by FERC's regulatory powers to modify or abrogate FERC-jurisdictional contracts. *Mirant*, 378 F.3d at 522 ("The FPA does not preempt a district court's jurisdiction to authorize the rejection of an executory contract subject to FERC regulation as part of a bankruptcy proceeding."); *see also In re FirstEnergy Sols. Corp.*, 945 F.3d 431, 446 (6th Cir. 2019) (bankruptcy court jurisdiction to reject executory contract "is primary or superior to FERC's position . . . and FERC cannot independently prevent it."); *In re Ultra Petroleum Corp.*, No. 20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020) (asserting that "proceeding with the petition before FERC…or FERC's ruling on the petition…would violate the automatic stay arising under Section 362(a) of the Bankruptcy Code").

66.    In *Mirant*, the debtor-power producer sought to reject a power agreement, a FERC-regulated contract governed by the FPA.  While the rejection motion was pending, the bankruptcy court entered two injunctions enjoining FERC from taking any action to require the debtor to continue performing under the agreement or any of the debtor's other agreements.  *Mirant*, 378 F.3d at 516; *see also In re Mirant Corp.*, 299 B.R. 152, 170 (Bankr. N.D. Tex. 2003).  The district court withdrew the reference, vacated the bankruptcy court's injunctions, and denied the debtor's

motion to reject, holding that such motion was a prohibited "attempt to avoid [its]…obligations… at the filed rates FERC has found to be just and reasonable." *In re Mirant Corp.*, 303 B.R. 304, 314 (N.D. Tex. 2003). The Fifth Circuit reversed and remanded. *Mirant*, 378 F.3d at 526.

67.     The Fifth Circuit "conclude[d] that the FPA does not preempt Mirant's rejection." *Id.* at 519-20. The court further opined that "a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate." *Id.* at 523 ("The concern that the bankruptcy court expressed—that FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract—is certainly a legitimate basis for injunctive relief."). In sum, the District (or Bankruptcy) Court is the sole arbiter of rejection under section 365 of the Bankruptcy Code.

68.     In so holding, the Fifth Circuit did no violence to FERC's jurisdiction, acknowledging that "FERC has the exclusive authority to determine the reasonableness of wholesale electricity rates under the FPA," and that under the filed rate doctrine, "the reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts." *Id.* at 518 (quoting *Miss. Power & Light Co. v. Miss. Ex rel. Moore*, 487 U.S. 354, 371, 375 (1988).

69.     Nevertheless, the notion that FERC has jurisdiction over motions to reject FERC-jurisdictional executory contracts under Section 365 of the Bankruptcy Code is unsustainable. *Mirant* distinguished the concepts of (i) breach, and (ii) rate modification/challenge, noting that, outside of bankruptcy, FERC's jurisdiction over the former is not exclusive. *Id.* at 519-20 (*citing Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1472 (5th Cir. 1987) (district court permitted to grant relief on FERC governed contracts where breach caused an increase in quantity

purchased at the filed rate, and permitted to set aside energy contract altogether, even though this remedy would affect the filed rate by eliminating it entirely, so long as damages are calculated using the filed rate, noting that Congress did not mean for the FPA "to preempt such indirect effects" on filed rates)).   FERC has acknowledged its jurisdictional limitations outside of bankruptcy.[81]

70.     With respect to the injunction, the Fifth Circuit held that it was "needed to protect the reorganization process because any regulatory action FERC took with regard to a particular contract would divest the court of its jurisdiction over the contract." *Mirant*, 378 F.3d at 516.  The court also noted the bankruptcy court's worry that "FERC could negate Mirant's rejection of an executory power contract by ordering Mirant to continue performing under the terms of the rejected contract[] *is certainly a legitimate basis for injunctive relief.*"  *Id.* at 523 (emphasis added).

71.     Similarly, in *FirstEnergy*, the Sixth Circuit was faced with the question whether FERC could compel the debtor to assume FERC-regulated electricity-purchase contracts in chapter 11.  945 F.3d at 443.  The court concluded that the bankruptcy court's jurisdiction was "primary or superior to FERC's position."  *Id.* at 446.  Moreover, the Sixth Circuit held that the debtor could "*reject the contracts subject to proper bankruptcy court approval and FERC cannot independently prevent it.*"  *Id.* (emphasis added).

72.     In the most recent decision in this Circuit on the issue, the bankruptcy court for the Southern District of Texas reaffirmed its jurisdiction to authorize the rejection of a firm transportation agreement without FERC action despite assertions to the contrary.  In *In re Ultra*

---

[81]   "[B]reach of contract issues … are matters better dealt with by courts of competent jurisdiction rather than through Commission review."  *Southern Co. Energy Mktg, L.P.*, 86 FERC ¶ 61,131 at 61,459 (1999); *see also Nevada Power Co.*, 111 FERC ¶ 61,111, at ¶ 15 (2005) (breach of a FERC-regulated service contract is a "straightforward matter of contract interpretation" that "is not important in relation to the regulatory responsibilities of the Commission" and is "better left to a court").

*Petroleum Corp.*, a natural gas pipeline filed a petition with FERC, substantially similar to the Petitions filed by the FERC Contract Counterparties, seeking to upend the bankruptcy court's jurisdiction under section 365 of the Bankruptcy Code by requesting substantially the same relief requested in the Petitions.[82]  No. 20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020).  The bankruptcy court held that "proceeding with the petition before FERC…or FERC's ruling on the petition…would violate the automatic stay arising under Section 362(a) of the Bankruptcy Code"[83] and any ruling by FERC during the chapter 11 cases would be void.[84]  After the contract-counterparty submitted a draft amended petition for the court's consideration, which draft amended petition would have sought an order from FERC that the public interest would be harmed by rejection of the relevant contract,[85] the bankruptcy court again ruled that issues related to rejection are properly litigated in the bankruptcy court and any FERC proceeding "is doomed to be either a failure or unhelpful" to the rejection process.[86]  There was "just far too much in the request made to FERC [in the draft amended petition] that plainly usurps the Court's exclusive determination as to whether to approve a rejection."[87]  Further, after FERC filed an emergency motion to reconsider the ruling, the bankruptcy court entered an order denying FERC's emergency

---

[82]   Petition for Declaratory Order and Requested Expedited Action, dated April 29, 2020, FERC Dkt. No. RP20-822-000 at 26; *see also* Tiger Petition at 3; Gulf South Petition at 14, 19.

[83]   *In re Ultra Petroleum Corp.*, Hr'g Tr. 53: 25–54: 4 (Bankr. S.D. Tex. May 29, 2020).

[84]   *Id.* at 55: 6–7.

[85]   *See In re Ultra Petroleum Corp.,* No. 20-32631 (MI) (Bankr. S.D. Tex. June 8, 2020) [Dkt. No. 232].

[86]   *In re Ultra Petroleum Corp.*, Hr'g Tr. 13:19–20 (Bankr. S.D. Tex. June 15, 2020).

[87]   *Id.* at 13: 21–24.

motion, stating that FERC's arguments "fundamentally miscomprehend[]" the court's statements.[88]

73.     Likewise, the Bankruptcy Court for the District of Delaware just recently held in *Extraction Oil & Gas* that a "request for stay relief to obtain FERC's position as to whether rejection of the [agreements] during this bankruptcy proceeding is consistent with the public interest and the [Interstate Commerce Act] is based on a false premise."[89]   The court explained that "FERC's recent statement in *ETC Tiger Pipeline, LLC* that the '[r]ejection of a Commission-jurisdictional contract in bankruptcy court alters the essential terms and conditions of a contract that is also a filed rate'"—a statement reiterated in each of the FERC orders at issue here—"is incorrect."[90]   Rather, as the U.S. Supreme Court recently held, "[t]he effect of a debtor's rejection of a contract under section 365 is that '[i]t gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract.'"[91]   In *Extraction*, the request sought to institute a proceeding that would be "completely irrelevant" to the issues before the bankruptcy court.[92]   The bankruptcy court therefore held that because it and FERC "do not exercise concurrent jurisdiction, rather they exercise parallel exclusive jurisdiction," it necessarily "would be a violation of this Court's exclusive jurisdiction over the rejection of executory contracts for FERC to purport to decide the issue [the contract counterparty] wishes to present."[93]

---

[88]     *See In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bank. S.D. Tex. June 25, 2020) [Dkt. No. 318].

[89]     *In re Extraction Oil & Gas, Inc.*, 20-11548-CSS, Dkt. No. 770, at 2 (Oct. 4, 2020).

[90]     *Id.*

[91]     *Id.* (quoting *Mission Product Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019)).

[92]     *Id.*

[93]     *Id.*

74.     These holdings are unsurprising.  After all, rejection is merely a breach of contract.

11 U.S.C. § 365(g) ("rejection of an executory contract . . . constitutes a breach of such contract").

*See also Mission Product Holdings, Inc. v. Tempnology*, 139 S.Ct. 1652, 1661-62 (2019) ("[A]

rejection is a breach" and is "neither a defined nor a specialized bankruptcy term.  It means in the

Code what it means in contract law outside bankruptcy.").  Neither FERC nor the FERC Contract

Counterparties contests that "[o]utside of the bankruptcy context…[nothing] provide[s] FERC

with exclusive jurisdiction over the breach of a FERC approved contract."  *Mirant*, 378 F.3d at

519.  Thus, there is no justification to arrive at a different answer in bankruptcy where the term

rejection stands in for breach.

75.     Additionally, 28 U.S.C. § 1334(a) provides this Court with exclusive jurisdiction

over bankruptcy cases and 28 U.S.C. § 1334(e) provides that the Court "shall have exclusive

jurisdiction [] of all of the property, wherever located, of the debtor as of the commencement of

such case, and of property of the estate."  In addition, section 365(a) applies to "any" executory

contract.  11 U.S.C. § 365(a); *see also Mission Product*, 139 S.Ct. at 1662 ("Sections 365(a) and

(g) speak broadly to any executory contracts.") (internal quotations omitted); *Dep't of Housing

and Urban Development v. Rucker*, 535 U.S. 125, 131 (2002) ("As we have explained, the word

'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (some

internal quotation marks omitted); *In re Hydro Action, Inc.*, 266 B.R. 638, 645 (Bankr. E.D. Tex.

2001) ("'Any' means any.").

76.     A debtor's contract rights are of course property of the estate.  *See In re Edgeworth*,

993 F.2d 51, 55 (5th Cir. 1993).  And a motion to reject under section 365 falls squarely within a

bankruptcy court's core jurisdiction.  28 U.S.C. § 157(b)(2).  Therefore, a debtor's ability to

assume or reject an executory contract is a "fundamental right authorized within the original *and*

*exclusive* jurisdiction conferred upon the district courts." *In re Texaco, Inc.*, 77 B.R. 433, 438 (Bankr. S.D.N.Y. 1987) (emphasis added); *see also In re Corp. de Servicios Medicos Hosp.*, 805 F.2d 440, 444 n. 3 (1st Cir. 1986) (Commonwealth of Puerto Rico "could not obtain subject matter jurisdiction" to terminate debtor's contract); *In re Webster Place Athletic Club, LLC*, 605 B.R. 526, 531 (Bankr. N.D. Ill. 2019) ("lease assumption issues can only arise in the context of bankruptcy cases"); *In re Transcolor Corp.*, 258 B.R. 149 (Bankr. D. Md. 2001) ("propriety of [debtor's] rejection of its executory lease" is a "core matter[] firmly 'within the original and exclusive jurisdiction' of the bankruptcy court"); *In re Owen-Johnson*, 115 B.R. 254, 257 (Bankr. S.D. Cal. 1990) ("The issue of whether a contract is executory, and whether it may be assumed or rejected by the debtor, is a matter of bankruptcy law over which the state court has no power to rule."); *see also In re Sandridge Energy, Inc.*, No. 16-32488 (DRJ), 2016 Bankr. LEXIS 4622, at *28 (Bankr. S.D. Tex. Sep. 20, 2016) ("The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed and to enter a final order with respect thereto.").

77.     Based on the unambiguous decisions holding that FERC cannot impair, interfere, prevent, or challenge this Court's jurisdiction to decide rejection motions, the statutory and equitable powers granted to this Court, and the rights afforded to Gulfport under the Bankruptcy Code, Gulfport's likelihood of success on the merits of its claims for relief is a near certainty.

## B.     Absent An Injunction, Gulfport Will Suffer Irreparable Harm.

78.     Gulfport's ability to reorganize as allowed by the Bankruptcy Code will be threatened if FERC is allowed to issue or enforce any order or ruling that (a) might interfere with this Court's exclusive jurisdiction to decide any motion to reject that Debtors may bring, (b) may hinder the Court's ability to administer the reorganization of the Debtors' estates, or (c) purports to enforce or compel performance of obligations of the Debtors under any contract for which

rejection is approved by the Court.  Losing the ability to effectively reorganize would obviously cause irreparable harm to the Debtors and their stakeholders.  In rejection motions, through the careful exercise of informed business judgment, Gulfport would identify Firm Transportation Agreements that are unnecessary to its business and highly burdensome to its estate.  Indeed, the Debtors stand to lose hundreds of millions of dollars over the life of the Firm Transportation Agreements, and rejecting some of them is clearly necessary for the Debtors' successful reorganization.  Further, the Debtors have entered into a restructuring support agreement (the "RSA") executed by the Debtors' revolving credit facility lenders holding over 95% of the bank loan and bondholders holding over two-thirds of the Debtors' unsecured notes.  The RSA and the transactions contemplated thereby, including the chapter 11 plan of reorganization attached thereto and the exit facility contemplated by the RSA, require the Debtors to reduce their obligations under the Firm Transportation Agreements in order to bring these high unnecessary fixed costs in line with the Debtors' go-forward business plan.

79.     As discussed above, the ability to reject an executory contract "is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."  *Mirant*, 378 F. 3d at 517.  Rejection is "vital" because in many cases, the debtor could not emerge from bankruptcy as a going concern, if it were forced to specifically perform under burdensome executory contracts.  *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n*, 826 F.2d 434, 436 (6th Cir. 1987) ("Rejection denies the right of the contracting creditor to require the bankrupt estate to specifically perform the then executory portions of the contract.").

80.     Indeed, the Fifth Circuit has already concluded that the prospect of FERC seizing control over contracts clearly constitutes irreparable harm under the Bankruptcy Code:

> The concern that the bankruptcy court expressed—that FERC could negate Mirant's rejection of an executory power contract . . . is certainly a legitimate basis for injunctive relief.  For example, a bankruptcy court can clearly grant injunctive relief to prohibit FERC from negating Mirant's rejection by requiring continued performance at the pre-rejection filed rate.

*Mirant*, 378 F.3d at 523.

81.     Without an injunction, FERC could issue or enforce an order or ruling that (a) might interfere with this Court's exclusive jurisdiction to decide any motion to reject that Debtors may bring, (b) may hinder the Court's ability to administer the reorganization of the Debtors' estates, or (c) purports to enforce or compel performance of obligations of the Debtors under any contract for which rejection is approved by the Court.  Thus, Gulfport would be forced to either refrain from exercising its right to reject in bankruptcy, or else absent injunctive relief exercise that right and risk FERC claiming Gulfport violated FERC's orders and taking enforcement action.  FERC might seek to compel Gulfport to perform under the Firm Transportation Agreements, or else subject Gulfport to civil penalties for violating its orders.  Gulfport would be forced to litigate FERC's enforcement of the orders, a process that would take place outside the bankruptcy court, that would certainly give rise to competing (and at a minimum, confusing) jurisdictional issues, and on a timetable wholly divorced from these bankruptcy cases.

82.     Moreover, any adverse ruling from FERC (at some unknown time in the future) could leave Gulfport forced to appeal to a federal court of appeals for relief from the FERC orders—a process that could take several years to complete.  15 U.S.C § 717r ("Any party to a [FERC] proceeding…aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States."); *see also, e.g., Atlanta Gas Light Co. v. FPC*, 476 F.2d 142, 150 (5th Cir. 1973) (affirming district court dismissal of declaratory action because, under the NGA, "[FERC] and, on review, the court of appeals were the proper forums"); *see also Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602,

605 (6th Cir. 2010) ("Exclusive means exclusive, and the [NGA] nowhere permits an aggrieved party otherwise to pursue collateral review of a FERC certificate in state court or federal district court."); *Hunter v. FERC*, 348 F. App'x 592, 593 (D.C. Cir. 2009) ("Congress has vested exclusive jurisdiction in the courts of appeals to review FERC's orders, pursuant to section 19(b) of the Natural Gas Act.") (citation omitted).  And in the meantime, during the lengthy appeals process, Gulfport could be forced by FERC to perform under the Firm Transportation Agreements, harming the estate and impeding successful reorganization.

83.     That is the sort of harm suffered by the debtors in *NRG Energy*.  There, before any injunction was issued, FERC compelled the debtor's performance under an executory power agreement the debtor sought to reject.  *In re NRG Energy, Inc.*, No. 03 CIV.3754 RCC, 2003 WL 21507685, at *3-5 (S.D.N.Y. June 30, 2003).  Even after the bankruptcy court granted the debtor's motion to reject the contract, FERC entered a second order requiring the debtor to perform under the *rejected* contract, effectively disregarding the bankruptcy court's order.  *Id.* at *2.  The plaintiff sought an injunction from the district court, but the district court held that "were the issues before the Court not to affect FERC's regulatory authority, the Court would properly possess jurisdiction," but because FERC acted first "within its legal authority . . . when it ordered Plaintiff to continue to comply with its obligations under the Agreement," plaintiff's only "appropriate remedy [is] [to] seek review of FERC's order by a federal court of appeals.  This Court, however, is not the proper forum for the Plaintiffs to challenge FERC's regulatory action."  *Id.* at *4.

84.     Seeking relief from a federal court of appeals could mean that Gulfport would have to continue performing under the burdensome requirements of the Firm Transportation Agreements, and would be unable to consummate the restructuring contemplated by the RSA.  As a result, the estate's assets could be dissipated at an annual rate of tens of millions of dollars to the

detriment of the reorganization process and the Debtors' creditors.  The reorganization process would likely be delayed for a significant time as no plan could be finalized until the Debtors and their creditors awaited the outcome of an appeal.

      **C.**    **Injunctive Relief Would Harm Neither FERC Nor the FERC Contract Counterparties.**

85.     As an initial matter, neither FERC nor the FERC Contract Counterparties would be harmed by an injunction premised on *Mirant*.  That decision has been issued, outstanding, and binding on district and bankruptcy courts in the 5th Circuit since 2004.  There is no harm in ordering an injunction premised on the "law of the land."

86.     Additionally, an injunction would leave FERC unharmed because its exclusive authority to regulate the natural gas market would be left fully intact.  Specifically, FERC's power to regulate filed rates for the transportation of natural gas—which has been FERC's basis in the past for claiming jurisdiction over the rejection of contracts—will be unaffected by an injunction. Indeed, the court in *Mirant* found that rejection of a filed rate contract was *not* a collateral attack on the filed rate.  *Mirant*, 378 F.3d at 522 ("A motion to reject an executory power contract is not a collateral attack upon that contract's filed rate because that rate is given *full effect* when determining the breach of contract damages resulting from the rejection.").  Rather, any rejection of FERC-regulated contracts would actually vindicate the FERC-approved rates set forth in the Firm Transportation Agreements by allowing damages *at* those filed rates through the claims process.

87.     Nor would an injunction harm the FERC Contract Counterparties.  The FERC Contract Counterparties will be allowed to oppose any rejection motion filed with the Court, and they will be entitled to assert a proof of claim based on applicable breach of contract damages.  *Id.*

This will leave the FERC Contract Counterparties in the same position as all of the Debtors' other unsecured creditors, as contemplated under the Bankruptcy Code.  *Id.*

### D.    Public Policy Favors Issuing the Injunction.

88.    In bankruptcy, public policy favors "an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate." *In re OGA Charters, LLC*, 554 B.R. 415, 426 (Bankr. S.D. Tex. 2016) (citing *In re T–H New Orleans Ltd. P'ship,* 188 B.R. 799, 807 (E.D. La. 1995), *aff'd,* 116 F.3d 790 (5th Cir.1997)); *see also In re PTI Holding Corp.*, 346 B.R. 820, 832 (Bankr. D. Nev. 2006) ("The public interest in successful reorganizations is significant.").

89.    Here, preventing FERC from taking actions under the NGA interfering with the bankruptcy court's exclusive rejection powers under the Bankruptcy Code will serve that interest by ensuring that FERC does not have the ability to prioritize certain claimants, such as the FERC Contract Counterparties, over those that are similarly situated.  *See Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (citing legislative history stating that the bankruptcy code's "preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor"). Moreover, an injunction in this case would not interfere with FERC's ability to act under the NGA to regulate the transportation and sale at wholesale of natural gas in interstate commerce and thereby ensure the plentiful supply of natural gas.  Even if this Court later grants rejection, that will not cause any disruption in the supply of natural gas to consumers but merely constitute nonpayment of money to the FERC Contract Counterparties.

## II.    This Court Can Also Enjoin FERC Under Section 362.

90.    This Court has authority to enjoin FERC from issuing or enforcing orders as sought here, pursuant to the automatic stay provision under section 362 of the Bankruptcy Code, which prohibits "all entities," including FERC, from taking any "act" to "exercise control over property

of the estate." 11 U.S.C. § 362(a)(3).  The automatic stay provided by section 362 "is in the nature of an automatic injunction."  *Matter of Sullivan Cent. Plaza, I, Ltd.*, 914 F.2d 731, 733 (5th Cir. 1990), *on reh'g sub nom. Matter of Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723 (5th Cir. 1991); *cf. In re Colonial Realty Co.*, 980 F.2d 125, 132, 137 (2d Cir. 1992) (confirming automatic stay applies to FDIC-Receiver attempt to recover fraudulent transfer "automatically . . . without any need for the intervention of any court or ruling").

91.     Thus, when the debtor seeks injunctive relief to enforce the automatic stay, it "need not comply with traditional requirements of Rule 65." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 436 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81 (2d Cir. 2014).

92.     The debtor need only "show what property of the estate is implicated and that some entity . . . is attempting to . . . exercise control over [that] property . . . ." *Golden Distribs. Ltd. v. Reiss (In re Golden Distribs. Ltd.)*, 122 B.R. 15, 19 (Bankr. S.D.N.Y. 1990); *see also Turbowind Inc. v. Post St. Mgmt. Inc. (In re Turbowind, Inc.)*, 42 B.R. 579, 586-87 (Bankr. S.D. Cal. 1984). By definition, any FERC effort to force Gulfport to perform under the Firm Transportation Agreements would be an exercise of "control" over the property of the estate.  *See Edgeworth*, 993 F.2d at 55; *In re Morrison*, 409 B.R. 384, 393 (S.D. Tex. 2009) ("A debtor's legal claims constitute property of the estate . . . .").

93.     The automatic stay guarantees debtors "a breathing spell from [their] creditors" and centralizes all "disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas."

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990).  Indeed, Congress recognized the importance of a broad reading of the stay in codifying sections 361 and 362(a):

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy . . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

S. Rep. No. 95-989, at 5835, 5840-41 (1978).

94.     While there are exceptions to the automatic stay, none apply here.   Section 362(b)(4) provides that the automatic stay shall not apply to actions "by a governmental unit . . . to enforce such government unit's . . . police or regulatory power, including the enforcement of a judgment other than a money judgment . . . ."  11 U.S.C. § 362(b)(4); *see Mirant*, 378 F.3d at 523.[94]  This is a "limited exception" intended for regulatory actions that are needed for the government "to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws" while the bankruptcy is ongoing.  *S.E.C. v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (quoting legislative history).  The exception to the stay helps to "ensure that debtors do not use a declaration of bankruptcy to avoid the consequences of their actions that threaten the public interest."  *In re Halo Wireless, Inc.*, 684 F.3d 581, 588 (5th Cir.

---

[94]   The question of whether the exception to the 362 automatic stay applied to FERC proceedings was not directly addressed in *Mirant*.  Only in dicta, in a summary of the lower courts' proceedings, the court stated that the bankruptcy court relied upon section 105 to enjoin FERC because "FERC is exempt from the Bankruptcy Code's automatic stay provision."

2012); *see Brennan,* 230 F.3d at 71 (stating that the purpose of the exception is to "prevent a debtor from frustrating necessary governmental functions by seeking refuge in bankruptcy court.").

95.     Indeed, this Court has recently held that FERC's proceeding with a petition seeking a declaratory order that it has concurrent jurisdiction with the bankruptcy court with respect to the rejection of a FERC-regulated firm transportation services agreement would violate the automatic stay under section 362(a) of the Bankruptcy Code, without noting any exceptions, and that any ruling by FERC during the bankruptcy would be void.  *In re Ultra Petroleum Corp.*, No. 20-32631, Ad. Proc. No. 20-03167 (MI) (S.D. Tex. April 26, 2020).

96.     Accordingly, section 362 stays any FERC action that might result in it issuing or enforcing any order or ruling that (a) might interfere with this Court's exclusive jurisdiction to decide any motion to reject that Debtors may bring, (b) may hinder the Court's ability to administer the reorganization of the Debtors' estates, or (c) purports to enforce or compel performance of the obligations of the Debtors under any contract for which rejection is approved by the Court.

## PLAINTIFFS' FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

97.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  Bankruptcy courts, as units of the district court, have the authority to issue declaratory judgments to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting violation of rights or disturbance of relationships.

98.     Courts possess jurisdiction to issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

99.     Given the Petitions, there is a substantial controversy between Gulfport and FERC of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

100.     It is necessary and appropriate for this Court to issue a declaratory judgment that (i) the Court has exclusive jurisdiction—which FERC cannot preempt or negate—over the Debtors' right to reject the Firm Transportation Agreements under section 365 of the Bankruptcy Code; (ii) the Debtors do not need FERC's approval or any other authorization under the NGA  to reject the Firm Transportation Agreements under the Bankruptcy Code; and (iii) FERC cannot act under the NGA to enforce the Debtors' obligations or compel the Debtors' continued performance of any Firm Transportation Agreement for which rejection is approved.

## PLAINTIFFS' SECOND CLAIM FOR RELIEF
### (Injunctive Relief)

101.     Plaintiffs seek a temporary restraining order and preliminary and permanent injunctions enjoining FERC from interfering with the Debtors' rights to reject the Firm Transportation Agreements pursuant to section 365 of the Bankruptcy Code.  Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

102.     The Fifth Circuit utilizes the traditional four part standard for determining whether a bankruptcy court should issue an injunction: (i) a substantial likelihood that the movant will prevail on the merits; (ii) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (iii) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (iv) that the granting of the

injunction will not disserve the public interest.  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 765 (5th Cir. 1995).

103.    Plaintiffs meet all four elements for injunctive relief.  ***First***, Plaintiffs are highly likely to succeed on the merits.  Under the Bankruptcy Code, executory contracts automatically become part of the bankruptcy estate once the bankruptcy is filed, and the automatic stay prohibits "all entities" from taking any "act" to "exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  There is no question that any effort by FERC to compel Gulfport to perform under the Firm Transportation Agreements, or to convene or continue a hearing to address the Plaintiffs' rights and obligations respecting the Firm Transportation Agreements, would clearly constitute an exercise of "control" over this property of the bankruptcy estates, and therefore, a violation of the automatic stay.

104.    ***Second***, there is a substantial threat the Plaintiffs will suffer irreparable injury if injunctive relief is not granted.  The Debtors' ability to reorganize under the Bankruptcy Code will be threatened if FERC is allowed to issue or enforce any order or ruling that would interfere with this Court's exclusive jurisdiction or that would hinder the Court's ability to administer the reorganization.  Losing the ability to effectively reorganize would obviously cause the Debtors irreparable harm.

105.    ***Third***, the balance of interests favors Plaintiffs.  Neither FERC nor the FERC Contract Counterparties would be harmed by an injunction.  An injunction would leave FERC unharmed because its exclusive authority to regulate the natural gas market would be left fully intact.  The FERC Contract Counterparties would be unharmed as they will be allowed to oppose any rejection motion filed with the Court and they will be entitled to assert a proof of claim based on applicable breach of contract damages.

106.     *Fourth*, the public interest favors issuance of the injunction.  In bankruptcy, public policy favors "an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate." *In re OGA Charters, LLC*, 554 B.R. 415, 426 (Bankr. S.D. Tex. 2016) (citing *In re T–H New Orleans Ltd. P'ship,* 188 B.R. 799, 807 (E.D. La. 1995), *aff'd,* 116 F.3d 790 (5th Cir. 1997)); *see also In re PTI Holding Corp.*, 346 B.R. 820, 832 (Bankr. D. Nev. 2006) ("The public interest in successful reorganizations is significant.").  Action taken by FERC requiring Gulfport to seek its approval to reject the Firm Transportation Agreements or compelling Gulfport's performance under the Firm Transportation Agreements would violate this Court's jurisdiction over the Debtors' estates, as well as the integrity of the Debtors' reorganization process, and otherwise burden the Debtors.

107.     Finally, the circumstances justify the issuance of an *ex parte* TRO because FERC's claim of concurrent jurisdiction with this Court (i) is a deliberate attempt to arrogate this Court's exclusive jurisdiction to adjudicate issues of contract rejection, (ii) directly and substantially interferes with the administration of the Debtors' estates, and (iii) puts the Debtors in an untenable position by potentially litigating complex issues in two different forums simultaneously.  An *ex parte* TRO must be granted immediately in order to protect the Debtors from further attempts by FERC to exercise control over the Debtors' estates and the administration of these chapter 11 cases.

108.     The Court should enforce the automatic stay by issuing a TRO, followed by a preliminary and permanent injunction preventing FERC from interfering with this Court's exclusive jurisdiction to decide any rejection motions or otherwise hindering the Court's ability to administer the reorganization of the Debtors' estates.

WHEREFORE, the Plaintiffs request relief as follows:

A.      That this Court issue a declaratory judgment that (a) the Court has exclusive jurisdiction—which FERC cannot preempt or negate—over the Debtors' right to reject the Firm Transportation Agreements under section 365 of the Bankruptcy Code; (b) the Debtors do not need FERC's approval to reject the Firm Transportation Agreements; and (c) FERC cannot enforce the Debtors' obligations or compel the Debtors' performance under any contract for which rejection is approved;

B.      That this Court, pursuant to section 105 of the Bankruptcy Code, issue a preliminary and permanent injunction preventing FERC from (a) interfering with this Court's jurisdiction to decide any motion to reject that may be filed by the Debtors to reject an executory contract, (b) otherwise hindering the Court's ability to administer the reorganization of the Debtors' estates; or (c) purporting to enforce or compel performance of obligations of the Debtors under any contract for which rejection is approved;

C.      Alternatively, that this Court, pursuant to section 362 of the Bankruptcy Code, issue a preliminary and permanent injunction preventing FERC from (a) interfering with this Court's jurisdiction to decide any motion to reject that may be filed by the Debtors to reject an executory contract, (b) otherwise hindering the Court' ability to administer the reorganization of the Debtors' estates, or (c) purporting to enforce or compel performance of obligations of the Debtors under any contract for which rejection is approved; and

D.      That this Court grant any such other and further relief as is appropriate under the circumstances.

Houston, Texas
November 15, 2020

Respectfully Submitted,

/s/ Matthew D. Cavenaugh

| | |
|---|---|
| **JACKSON WALKER L.L.P.** | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Veronica A. Polnick (TX Bar No. 24079148)
Cameron A. Secord (TX Bar No. 24093659)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:       (713) 752-4221
Email:           mcavenaugh@jw.com
                 vpolnick@jw.com
                 csecord@jw.com

*Proposed Co-Counsel for the Debtors and
Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4600
Facsimile:       (212) 446-4800
Email:           edward.sassower@kirkland.com
                 steven.serajeddini@kirkland.com

-and-

Christopher S. Koenig (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:            chris.koenig@kirkland.com

-and-

Anna G. Rotman, P.C. (TX Bar No. 24046761)
Jamie Alan Aycock (TX Bar No. 24050241)
Diana Clough Benton (TX Bar No. 24116098)
(admitted *pro hac vice*)
609 Main Street
Houston, TX 77002
Telephone:       (713) 836-3600
Facsimile:       (713) 836-3601
Email:           anna.rotman@kirkland.com
                 jamie.aycock@kirkland.com
                 diana.benton@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in
Possession*

27361196v.2 141006/00002

<u>**Certificate of Service**</u>

I certify that on November 15, 2020, I caused a copy of this document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  A copy of this filing was also e-mailed to FERC's counsel at Robert.Solomon@ferc.gov, John.Shepherd@ferc.gov, and to the United States Attorney's office at Richard.Kincheloe@usdoj.gov to alert them to the existence of this filing and the relief sought.  The undersigned believes that no further notice should be given due to FERC's actions in attempting to get in front of the filing of these chapter 11 cases.

/s/ *Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**VERIFICATION FOR GULFPORT ENERGY CORPORATION'S VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, *EX PARTE* TEMPORARY RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTION**

I, Quentin R. Hicks, declare as follows:

I am the Executive Vice President and Chief Financial Officer of Gulfport Energy Corporation and am duly authorized to execute this verification on behalf of the above-captioned debtors (the "Debtors").

1.     I have read the foregoing Gulfport Energy Corporation's Verified Complaint for Declaratory Judgment, *Ex Parte* Temporary Restraining Order, and Preliminary and Permanent Injunction.

2.     To the extent the allegations in the Complaint concern the actions of Gulfport Energy Corporation and the harm that would be suffered by Gulfport Energy Corporation if the requested relief is not granted, I know those allegations to be true and correct.

3.     To the extent the allegations in the Complaint concern the actions of individuals or entities other than the Company, I believe those allegations to be true and correct.

I declare under penalty of perjury that the foregoing is true and correct.  This declaration is executed in Oklahoma City, Oklahoma.

Executed on November 15, 2020          */s/ Quentin R. Hicks*
_____
                                                        Quentin R. Hicks
                                                        Executive Vice President and Chief Financial Officer
                                                        Gulfport Energy Corporation